Kevin Bratcher - 9/30/2021
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KEVIN BRATCHER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:20-cv-02056-SB |
| | ) |
| POLK COUNTY; CITY OF SALEM; | ) |
| DEPUTY MICHAEL H. SMITH, in | ) |
| his individual capacity; and | ) |
| DOES 1-4 in their individual | ) |
| capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

DEPOSITION OF KEVIN BRATCHER

Taken in Behalf of the Defendants

Thursday, September 30, 2021

Reported by:

D. Iwalani Carr, RPR, CSR

Kevin Bratcher - 9/30/2021
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 2

1  BE IT REMEMBERED THAT, pursuant to Federal
2  Rules of Civil Procedure, the deposition of KEVIN
3  BRATCHER was taken before D. Iwalani Carr, RPR, CSR, a
4  professional shorthand reporter certified by the State
5  of Oregon, that pursuant to ORS 44.320 said reporter is
6  empowered to administer oaths to witnesses, that the
7  above-named witness was placed under oath on Thursday,
8  September 30, 2021, commencing at the hour of 9:18 a.m.,
9  in the conference room of the Law Offices of Lafky &
10 Lafky, in the City of Salem, County of Marion, State of
11 Oregon.
12                        --o0o--
13
14                      APPEARANCES:
15
16 For the Plaintiff:
       Lafky & Lafky
17     By:  Marcus I. Vejar
       429 Court Street NE
18     Salem, OR 97301

19 For the County Defendants:
       Law Offices of Montoya Hisel and Associates
20     By:  Kenneth S. Montoya
       901 Capitol Street NE
21     Salem, OR 97301

22 For the City Defendants:
       City of Salem Legal Department
23     By:  Jennifer Gaddis
       555 Liberty St. SE, Room 205
24     Salem, OR 97301

25

Page 67

| | | |
|---|---|---|
| 1 | Q. | Hit anything? |
| 2 | A. | Just the flooring. |
| 3 | Q. | What kind of cell phone did you have at the |
| 4 | time? | |
| 5 | A. | An iPhone. |
| 6 | Q. | Any damage done do it? |
| 7 | A. | No, sir. |
| 8 | Q. | Do you have one of those fancy cases that -- |
| 9 | A. | I have a case on it. |
| 10 | Q. | -- impacts -- |
| 11 | A. | Yes, sir. |
| 12 | Q. | How soon after Salem PD gets there until |
| 13 | you're taken outside? | |
| 14 | A. | Within five minutes. |
| 15 | Q. | And did your Ring doorbell capture you being |
| 16 | taken outside? | |
| 17 | A. | I believe so, sir. |
| 18 | Q. | And you've given that to your attorney for him |
| 19 | to produce for us? | |
| 20 | A. | Yes, sir. |
| 21 | Q. | Describe how you folks left your residence. |
| 22 | Who was in front? | |
| 23 | A. | It was Deputy Smith on my right side, and one |
| 24 | of the Salem police officers on the left side. | |
| 25 | Q. | And you indicated the Salem officer grabbed |

10:36 (lines 5, 10, 15, 20, 25)

Page 68

1    your biceps?
2        A.   Yes, sir.
3        Q.   How did Deputy Smith have you?
4        A.   I believe he just had me on my arm, too.
5        Q.   Now, the way you described, you kind of put                10:37
6    your left hand over your right biceps and it looked
7    fairly loose.
8             Is that accurate?
9        A.   Yeah.  He didn't have -- he didn't have force
10   on.                                                                 10:37
11       Q.   Would you agree that it was an escort-type
12   hold?
13       A.   Yes, sir.
14       Q.   And was his position even with you or slightly
15   behind you?                                                         10:37
16       A.   Little bit behind me, I believe.
17       Q.   And the Salem officer?
18       A.   Beside me.
19       Q.   Even with you?
20       A.   I believe so.                                              10:37
21       Q.   Where was the other Salem officer?
22       A.   I can't remember if he walked out first or was
23   behind us.
24       Q.   And you had, like, a screen door; right?
25       A.   No, sir.                                                   10:37

Page 89

1  asks how things are going with it.
2     Q.   So it continues to bother you.
3     A.   Yes.
4     Q.   All right, sir.  Let's take a look at
5  paragraph 16, please, of your complaint, page 5.   11:02
6          Are you good?  Do you need a break?
7     A.   No, I'm good.
8     Q.   All right, sir.  Please read along with me to
9  make sure I read this accurately.
10         "Plaintiff was handcuffed and detained in      11:02
11 Deputy Smith's patrol car, only later being released and
12 cited at the order of an on-duty sergeant.  While being
13 brought to Deputy Smith's vehicle, Does 1 and 2 had
14 helped escort plaintiff, at which point one of the
15 officers had gripped plaintiff's left biceps so firmly  11:03
16 he had visible marks on his biceps.  Despite plaintiff
17 being injured by Deputy Smith and had difficulty
18 walking, Does 1 and 2 forcibly walked plaintiff a
19 distance of over a football field to detain him in
20 Deputy Smith's vehicle.  Plaintiff's foot was badly     11:03
21 injured due to Deputy Smith, and the actions of Does 1
22 and 2 only further contributed to plaintiff's pain and
23 suffering.  The altercation between plaintiff and Deputy
24 Smith resulted in extensive property damage to the
25 plaintiff's home by kicking in the door and injury to   11:03

Page 90

1  plaintiff through the use of force to effectuate the
2  arrest.  The district attorney's office for Polk County
3  did not pursue any other charges brought against
4  plaintiff."
5            Did I read that accurately, sir?                    11:04
6       A.   Yes, sir.
7       Q.   All right.  Here, it indicates you had
8  difficulty walking, but a few minutes ago you told us
9  you didn't notice anything to your foot until a half
10 hour later.                                                    11:04
11      A.   It didn't hurt, but I -- I had difficulty
12 walking, the shoes that I was wearing.
13      Q.   Why?
14      A.   I don't know.
15      Q.   You didn't have any difficulty walking when          11:04
16 you went out to throw the paper or come back in, did
17 you?
18      A.   No.
19      Q.   So why did you have difficulty walking out?
20      A.   I would assume because my foot was bothering         11:04
21 me, but I didn't notice it.
22      Q.   Does that make sense to you?
23      A.   Yeah.
24      Q.   It does?
25      A.   Mm-hm.                                                11:04

Kevin Bratcher - 9/30/2021
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 113

1   remote and toss it?
2        A.   I would say yes, ma'am.
3        Q.   And you stated it was thrown on the floor?
4        A.   Yes, ma'am.
5        Q.   Approximately how far away from you was it        11:55
6   thrown?
7        A.   To you to me, about three feet.
8        Q.   It wasn't thrown at you?
9        A.   No, ma'am.
10       Q.   Did it hit anything on the way down?              11:55
11       A.   Just the floor.
12       Q.   And you don't recall them saying anything to
13  you prior to throwing the cell phone.
14       A.   No.
15       Q.   Was there any damage done to the cell phone or    11:55
16  the remote?
17       A.   No, ma'am.
18       Q.   I'm going to show you a video.  And I
19  apologize for the numbering of my exhibits.  They're a
20  bit out of order because we had some duplicative ones.     11:55
21  So this is going to be COS Exhibit 104.
22            I've had my sound muted so I didn't disturb,
23  so bear with me.
24                           (COS Exhibit 104
25                            video played.)                    11:56

Kevin Bratcher - 9/30/2021
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 115

| | | |
|---|---|---|
| 1 | A. No, ma'am, other than probably telling them | |
| 2 | that I needed to shut my stimulator off. | |
| 3 | Q. So I don't want you to guess. So I just want | |
| 4 | to know if you actually heard specifically what you were | |
| 5 | telling them. | 11:58 |
| 6 | A. It's too garbled. | |
| 7 | Q. Okay. I'm going to keep playing it and I | |
| 8 | might stop it and ask you some more questions. Okay? | |
| 9 | (Video played.) | |
| 10 | Okay. Now, I've paused it at 1:04 of | 11:58 |
| 11 | Exhibit 104, and can you identify the law enforcement | |
| 12 | agency that has ahold of your right elbow? | |
| 13 | A. That's Deputy Smith on my right side. | |
| 14 | Q. And then on your left elbow, I know you can't | |
| 15 | identify a name, but is that Salem PD over on the left? | 11:58 |
| 16 | A. Yes, ma'am. | |
| 17 | Q. Okay. And it appears that Salem PD is | |
| 18 | trailing slightly behind you in the video. | |
| 19 | Is that correct? | |
| 20 | A. It looks that way, yes, ma'am. | 11:58 |
| 21 | Q. And probably not easy for three grown men to | |
| 22 | fit through a doorway at once? | |
| 23 | A. No. It's not a very wide space right there. | |
| 24 | Q. Okay. | |
| 25 | A. Once out in the driveway is whenever everybody | 11:59 |

Page 121

```
 1      A.   No, I do not.
 2      Q.   Was there anything that had happened
 3   immediately prior to the incident that would have
 4   caused --
 5      A.   No.                                              12:06
 6      Q.   Let me finish my question.  Sorry.
 7      A.   Okay.
 8      Q.   It's okay.  It's just for her benefit.
 9           -- that would have caused marks on your left
10   arm?                                                    12:07
11      A.   No.
12      Q.   Regarding the foot injury that you said you
13   started to feel approximately 30 minutes after the
14   incident, did you ever communicate that your foot was
15   injured to Salem police officers?                       12:07
16      A.   I didn't -- I didn't feel it at the time.
17      Q.   So you did not communicate that to --
18      A.   No.
19      Q.   And just to follow up, did you ever
20   communicate to Deputy Smith that you had a foot injury? 12:07
21      A.   No.
22      Q.   Are there any other injuries besides the
23   injuries to your left arm that you are alleging Salem
24   Police Department officers caused?
25      A.   No.                                             12:07
```

Page 129

1   2 then grabbed the cell phone and control device from
2   plaintiff's hand and threw them across the room without
3   any provocation from plaintiff."
4           Is that a correct reading of that sentence?
5       A.  Yes, ma'am.                                          12:17
6       Q.  Okay.  So as I understand your testimony
7   today, they took the cell phone and charger and threw
8   them on the floor.
9           Is that correct?
10      A.  Mm-hm.                                               12:17
11      Q.  Okay.  So a little different than here, but
12  they didn't throw it across the room at anything;
13  correct?
14      A.  It was kind of like a toss to the floor.
15      Q.  Okay.  Okay.  Thank you.                             12:17
16      A.  And that's what you could hear on the video,
17  me telling them I needed my stimulator remote to work on
18  my stimulator.
19      Q.  And Deputy Smith ultimately picked it up and
20  gave it back to you; right?                                  12:17
21      A.  Yeah.
22      Q.  Okay.  Great.
23          And in paragraph 16, I'm looking at the third
24  sentence:  "Despite plaintiff having been injured by
25  Deputy Smith and had difficulty walking, Does 1 and 2        12:17

Page 133

1  deputy's car.  I was complying with everything that was
2  going on.
3      Q.   You've already testified, however, that they
4  did not have any sort of extensive conversations with
5  Deputy Smith when they arrived; correct?                      12:22
6      A.   Yes, ma'am.  Not that I recall.
7      Q.   Okay.  They asked why you were cuffed in the
8  front, but that was it; correct?
9      A.   Yes, ma'am.
10     Q.   So how do you know that they were aware that         12:22
11 you didn't need to be guided to his vehicle in that
12 manner?
13     A.   Because I was complying with everything that
14 was being said, other than I was trying to get my remote
15 back for my stimulator to shut it off.                        12:22
16     Q.   Okay.
17          Is it possible that those marks could have
18 been caused when they were trying to fit through a door
19 that was not very wide?
20     A.   I don't know, ma'am.                                 12:22
21     Q.   Is it possible?
22     A.   Could be.  Maybe.
23     Q.   But certainly you don't remember a particular
24 moment where the Salem officer --
25     A.   No.                                                  12:23

Page 146

```
 1                      CERTIFICATE
 2
 3
 4        I, D. Iwalani Carr, a certified Shorthand
 5   Reporter for Oregon, hereby certify that, pursuant to
 6   Federal Rules of Civil Procedure, KEVIN BRATCHER
 7   personally appeared before me at the time and place set
 8   forth in the caption hereof; that at said time and place
 9   I reported in Stenotype all testimony adduced and other
10   oral proceedings had in the foregoing matter; that
11   thereafter my notes were reduced to typewriting under my
12   direction, and that the foregoing transcript, pages 1 to
13   145, both inclusive, constitutes a full, true and
14   accurate record of all such testimony adduced and oral
15   proceedings had, and of the whole thereof.
16
17
18        Witness my hand and CSR seal at Silverton,
19   Oregon, this 14th day of October, 2021.
20
21
22
23                              _____
                                D. Iwalani Carr
24                              Certified Shorthand Reporter
                                Certificate No. 90-0220
25                              License expires 9/30/22
```